IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TUMIKA IDELL JORDAN, | ) | CASE NO.  1:18-cv-00299 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Tumika Idell Jordan ("Plaintiff" or "Jordan") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying her application for social security disability benefits.  Doc. 1.  Jordan challenges the

ALJ's decision as it pertains to her alleged mental health impairments.  She does not challenge

the ALJ's decision regarding her alleged physical impairments.

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the

undersigned Magistrate Judge pursuant to the consent of the parties.  Doc. 13.  For the reasons

explained herein, the Court **AFFIRMS** the Commissioner's decision.

## I.  Procedural History

On May 19, 2014, Jordan protectively filed[1] an application for supplemental security

income ("SSI").  Tr. 20, 235-243.  Jordan alleged disability beginning on December 1, 2008.  Tr.

20.  She alleged disability due to bipolar disorder, manic depression, high blood pressure,

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 2/13/2019).

debilitating headaches, increased hallucinations, and dysphoria.  Tr. 160, 186, 178, 195, 268.

After initial denial by the state agency (Tr. 186-188) and denial upon reconsideration (Tr. 195-199), Jordan requested a hearing (Tr. 200-203).  On April 14, 2016, a hearing was held before Administrative Law Judge Scott R. Canfield ("ALJ" or "ALJ Canfield").  Tr. 39-94.  On March 2, 2017, the ALJ issued an unfavorable decision, (Tr. 17-38), finding that Jordan had not been under a disability, as defined in the Social Security Act, since May 19, 2014, the date the application was filed (Tr. 21, 34).

In reaching his decision, the ALJ noted that Jordan had previously filed an application for SSI on March 22, 2011.  Tr. 20, 141.  With respect to that earlier application, a different Administrative Law Judge issued an unfavorable decision on June 29, 2012, and the Appeals Council denied review of that decision on June 5, 2013.  Tr. 20, 138-155, 156-159.  In rendering his March 2, 2017, decision, ALJ Canfield determined that there was new and material evidence regarding Jordan's mental condition but no change in her physical condition.  Tr. 20.  Thus, per *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997),[2] the ALJ adopted the prior Administrative Law Judge's finding that Jordan had no severe physical impairments but did not adopt the prior mental residual functional capacity.[3]  Tr. 20.

---

[2] The Sixth Circuit recently explained that:

> The key principles protected by *Drummond*—consistency between proceedings and finality with respect to resolved applications—apply to individuals *and* the government.  At the same time, they do not prevent the agency from giving a fresh look to a new application containing new evidence or satisfying a new regulatory threshold that covers a new period of alleged disability while being mindful of past rulings and the record in prior proceedings.

*Early v. Comm'r of Soc. Sec.*, 893 F.3d 929, 931 (6th Cir. 2018) (emphasis in original).

[3] As discussed herein, Jordan does not challenge the ALJ's decision as it pertains to her alleged physical impairments.

Jordan requested review of the ALJ's March 2, 2017, decision by the Appeals Council. Tr. 231-234. On December 18, 2017, the Appeals Council denied Jordan's request for review, making the ALJ's March 2, 2017, decision the final decision of the Commissioner. Tr. 1-6.

## II. Evidence

### A.  Personal, vocational and educational evidence

Jordan was born in 1974. Tr. 160, 235. At the time of the hearing, Jordan lived with her partner and her 14-year-old daughter.[4] Tr. 50. Jordan has difficulty reading. Tr. 52. She completed school through the 11th grade. Tr. 51. She tried to obtain her GED but she did not complete the classes. Tr. 52, 74. Jordan's girlfriend had been taking her to GED classes but her girlfriend's work scheduled changed so Jordan stopped attending classes. Tr. 74. Jordan's past relevant work was as a housekeeper. Tr. 54-60. She last worked in that position in 2010. Tr. 60. Jordan was fired for crying on the floor at work. Tr. 60.

### B.  Medical evidence

#### 1.  Treatment history

On December 1, 2011, Jordan saw Dr. Jyoti Aneja, M.D., at MetroHealth for a pharmacologic management visit. Tr. 347. Jordan had not been in for two months. Tr. 347. She relayed it was the earliest that she was able to get in. Tr. 347. Jordan had stopped taking her medication due to side effects. Tr. 347. Jordan reported having problems with her family. Tr. 347-348. She felt that her siblings were mean to her and she was not allowed to be mean to anyone. Tr. 347. Jordan reported no conflict with her partner. Tr. 347. Jordan reported having racing thoughts, crying spells and switching to feeling hyperenergetic. Tr. 348. Jordan was reminded of the importance of taking her psychiatric medication on a regular basis. Tr. 348. On

---

[4] Jordan has other children who were raised by other individuals. Tr. 482.

mental status examination, Dr. Aneja observed that Jordan was well groomed; her behavior was anxious; she was oriented to time, person and place; her speech was spontaneous with a normal rate and flow; she had racing and paranoid thoughts; she had no homicidal or suicidal ideation; there was no evidence of perceptual disturbances but Jordan reported A/V hallucinations; her mood was depressed and anxious; her affect was labile; her attention/concentration was impaired; her recent and remote memory were within normal limits; and her judgment was fair. Tr. 348. Dr. Aneja diagnosed major depression, recurrent and THC and alcohol dependence, continuous. Tr. 348. Because of Jordan's reports of side effects from her medication, Dr. Aneja restarted Jordan only on Seroquel XR (400 mg at bedtime) and Trazadone for sleep. Tr. 348.

Jordan saw Dr. Aneja on February 17, 2012. Tr. 354. Jordan reported no significant improvement in her depressive symptoms, fatigue, poor concentration and crying spells. Tr. 354-355. Dr. Aneja observed that Jordan was cooperative but anxious, tearful, and depressed. Tr. 355. She had paranoid thoughts, self-reported A/V hallucinations, impaired attention/concentration, and constricted, labile affect. Tr. 355. Her memory was within normal limits; her judgment/insight were fair; and she had no homicidal/suicidal thoughts. Tr. 355. Dr. Aneja switched Jordan from Seroquel XR to Effexor XR and continued her on Trazadone for sleep. Tr. 355. During an April 16, 2012, visit with Dr. Aneja, Jordan reported feeling a little better with her medication changes but she was still symptomatic. Tr. 373. On mental status examination, there was no evidence of paranoia or perceptual disturbances. Tr. 374. Jordan had no suicidal or homicidal ideations. Tr. 374. Her mood was anxious and dysphoric; her affect was labile; her concentration was sustained; her memory was within normal limits; and her judgment/insight were fair. Tr. 374. Dr. Aneja increased the Effexor XR dose and continued the Trazadone. Tr. 374.

When Jordan saw Dr. Aneja the following year on June 14, 2013, Jordan denied any major improvement in her moods. Tr. 473-476. She did report some good days but expected not to have any depression. Tr. 474-475. Jordan relayed that she now had a case manager from CC[5] who wanted Jordan to follow up at CC for her psychiatric services. Tr. 474. Jordan's case worker felt that she should be admitted to the psychiatric hospital for one week with the goal of helping her to get out and feel less depressed. Tr. 474. Jordan continued to report auditory hallucinations and crying spells. Tr. 474. Jordan indicated that her partner and older daughter were being very supportive, which had helped her a lot. Tr. 474. Dr. Aneja discussed some possible medication adjustments and advised Jordan, if she was interested in receiving psychiatric services through CC, Jordan should speak with her case worker about psychiatric services through CC. Tr. 475. On mental status examination, Dr. Aneja observed that Jordan's behavior was cooperative but anxious; she was well groomed; there was no derailment in thought process but she had paranoid thoughts; she had self-reported auditory hallucinations; her mood was depressed; her affect was labile; her memory was within normal limits; and her judgment/insight were fair. Tr. 475. Jordan's medications included Zoloft, Abilify, and Ativan. Tr. 475. Jordan relayed that Zoloft had worked better than any other antidepressant she had tried in terms of improvement in her mood and lesser side effects. Tr. 475.

On October 7, 2013, Jordan saw Dr. Aneja. Tr. 456-459. Dr. Aneja observed that Jordan appeared more positive than she had been during prior visits. Tr. 457. She was doing better with resolving conflicts with others and she was looking forward to an extended trip to Kentucky with her mother. Tr. 457. Jordan's sleep was uninterrupted and stable and she felt Abilify was helping with her depression and she noticed improvement with respect to her crying spells. Tr.

---

[5] "CC" likely stands for Catholic Charities. *See e.g.*, Catholic Charities Services' treatment records, dated May 31, 2013, through May 28, 2014. Tr. 507-523.

457.  Dr. Aneja felt that no adjustments to Jordan's medications were warranted since Jordan's mood and anxiety were stable.  Tr. 457.

When Jordan saw Dr. Aneja on November 22, 2013, Jordan reported feeling better and admitted that conflicts with her significant other had improved significantly.  Tr. 454.  Jordan had traveled to Kentucky with her mother but only stayed for 10 days because she "just wanted to be home."  Tr. 454.  Jordan reported having a poor appetite and some sleep walking episodes, which had started four months prior.  Tr. 454.  Dr. Aneja noted that Jordan had not raised the issue of sleep walking in the past.  Tr. 454.  She had last reported that her sleep was uninterrupted and stable.  Tr. 454.  Dr. Aneja added Remeron, an additional antidepressant to Jordan's medications, to try to address the poor sleep/appetite secondary to depression.  Tr. 454.  Dr. Aneja also continued Jordan on Abilify, Ativan and Zoloft.  Tr. 455.  Dr. Aneja observed Jordan to be anxious and dysphoric with a constricted affect.  Tr. 454.  She had paranoid thoughts but her thought process was logical and organized.  Tr. 454.  Jordan reported difficulty with her attention/concentration and memory.  Tr. 454.  Dr. Aneja observed no evidence of perceptual disturbance and her judgment/insight were fair.  Tr. 454.

During a January 24, 2014, visit with Dr. Aneja, Jordan reported that she was doing better than before.  Tr. 448.  Her sleep and appetite had improved significantly since starting on Remeron but she was continuing to report constant dysphoria and feeling unaffected by any change in life stressors, either positive or negative.  Tr. 448.  Jordan denied side effects from the Remeron.  Tr. 448-449.  Dr. Aneja explained that some of Jordan's depressive symptoms may be chronic and her goal may not be remission but prevention of any further decompensation and to maintain her current stability.  Tr. 449.  Dr. Aneja increased the Remeron dose and continued Jordan on Abilify, Ativan and Zoloft.  Tr. 448, 449.

When Jordan saw Dr. Aneja on May 5, 2014, Jordan reported doing better but her moods were fluctuating and she had suicidal thoughts a few weeks prior. Tr. 431. Jordan reported compliance with her medication but Dr. Aneja noted that Jordan's medication refill history contradicted her claim of compliance. Tr. 431. Jordan relayed that she was enrolled in a GED class but she was not doing well in the class due to her depressive moods. Tr. 431. Dr. Aneja recommended switching Jordan from Abilify to Depakote. Tr. 431. Jordan was in agreement with Dr. Aneja's recommendation. Tr. 431. On mental status examination, Dr. Aneja observed that Jordan was well groomed; she was cooperative and engaged; her thought process was logical and organized; there was no evidence of delusions or perceptual disturbance; her mood was anxious and dysphoric; her affect was constricted; her memory was within normal limits; and her judgment/insight were fair. Tr. 431. Dr. Aneja continued Jordan on Remeron, Ativan and Zoloft and switched the Ativan to Depakote. Tr. 432.

In addition to seeing Dr. Aneja, Jordan also attended behavioral health counseling sessions in 2014 with Kristen Liviskie, LISW-S. Tr. 428-429, 433-434, 441-443, 450-452.

Upon a referral from Catholic Charities (Tr. 480-481, 482),[6] on May 27, 2014, Ohio Guidestone completed an Adult Mental Health Assessment Test due to Jordan's depression. Tr. 482-488. The assessment was conducted at Jordan's home. Tr. 486. Jordan relayed that she had a low appetite and multiple symptoms of depression, including crying, low self-esteem, frequent crying, feeling that no one loved her, thoughts of death and suicide, hopelessness, helplessness, guilt, and irritability. Tr. 482. On mental status exam, Jordan was observed to be unkept, withdrawn, agitated, depressed, anxious, cooperative, restless, and had a flat affect. Tr. 484-485.

---

[6] Jordan had been receiving case management services through Catholic Charities during 2013 and 2014. *See* Tr. 507-524. During a May 21, 2014, session with her case manager at Catholic Charities, they discussed the possibility of changing therapists from MetroHealth to Guidestone. Tr. 508.

Jordan's speech was clear. Tr. 485. There were no reported delusions but she reported A/V hallucinations. Tr. 485. Impairment was noted in Jordan's memory, attention/concentration, judgment and insight. Tr. 485. Jordan reported that she had violent thoughts about people who made her mad but she had never acted on those thoughts. Tr. 485-486. The examiner assessed Jordan's symptoms to be severe and found major impairment in Jordan's level of functioning in the areas of work, school, family relations, social, judgment, thinking and mood. Tr. 486. Jordan was diagnosed with major depressive disorder, recurrent. Tr. 486. The severity of Jordan's symptoms were found to disrupt the following areas: employment; inability to contribute to one's own financial support; perception and cognition-of-reality capacity; stress management/coping skills; and interpersonal and social relationships. Tr. 486. The examiner noted that Jordan cried during most of the assessment and was clearly depressed. Tr. 486. Jordan reported some PTSD symptoms but the examiner noted that those symptoms appeared to be intertwined or overshadowed by Jordan's depression. Tr. 486. The examiner noted that Jordan expressed suicidal thoughts and would be going to the emergency room that day once her girlfriend returned from work and her adult daughter would be coming over to the house in the meantime. Tr. 486.

On October 24, 2014, Jordan saw Dr. Douglas Waltman at the Charak Center for Health & Wellness ("Charak") for an Adult Diagnostic Assessment. Tr. 550-563. Jordan's presenting problem was described as a seven-year history of depression with past diagnoses of bipolar disorder, schizophrenia, anxiety and borderline personality disorder. Tr. 550. With respect to psychiatric hospitalizations, the assessment notes that Jordan was referred but refused. Tr. 553. On mental status examination, Dr. Waltman observed that Jordan was unkempt; her eye contact was average; her activity was slowed; she was withdrawn with soft, pressured speech; she had

persecutory delusions and auditory hallucinations; her mood was depressed and anxious; her affect was flat; her behavior was cooperative; she had impaired concentration/attention; her intelligence was estimated to be borderline; and her insight/judgment were poor. Tr. 559. Dr. Waltman diagnosed schizoaffective disorder and rule out borderline personality disorder. Tr. 562. He assessed a GAF score of 30.[7] Tr. 562. Dr. Waltman referred Jordan for medication, case management, and consideration of a partial hospitalization program. Tr. 563.

An Initial Psychiatric Evaluation was also conducted the same day at Charak by Robert Toth, PharmD, and Rakesh Ranjan, M.D. Tr. 564-573. Jordan's treatment plan included individual therapy and a prescription for Latuda to target her mood. Tr. 572.

On November 21, 2014, Jordan saw Dr. Ranjan for medication management. Tr. 579-584. Jordan relayed that she was severely depressed and felt that her condition had worsened. Tr. 579. She reported being unable to enjoy life and was getting only 4-5 hours of sleep each night. Tr. 579. Jordan planned to schedule an appointment with a counselor as soon as possible. Tr. 579. Jordan's depressive symptoms were reported as severe and her mood swings, anxiety, irritability, racing thoughts, insomnia, decreased energy, impairment in concentration, and decreased interests were reported as moderate. Tr. 579. Jordan reported hearing voices (crowd of people in background and one person whispering) and seeing things (shadows). Tr. 579. On mental status examination, Dr. Ranjan observed that Jordan was well groomed; her eye contact

---

[7] As set forth in the DSM-IV, GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 21 and 30 indicates "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g. stays in bed all day; no job, home, or friends)." ("DSM-IV-TR"), at 34. With the publication of the DSM-5 in 2013, the GAF was not included in the DSM-5. *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fifth Edition, Arlington, VA, American Psychiatric Association, 2013 ("DSM-5"), at 16.

and motor activity were average; she was cooperative; her speech was clear/normal; she reported no delusions but reported hallucinations; her thought process was logical; her mood was depressed; her affect was full; her cognition was not impaired; her intelligence was average; her immediate memory was impaired; her insight/judgment were good; her impulse control was normal; she reported no obsessions or compulsions. Tr. 581. Jordan's medications included Latuda and Trileptal for her mood and Trazodone for her insomnia. Tr. 582. Dr. Ranjan found that Jordan's condition was deteriorating – she continued to experience severe depression. Tr. 583.

When Jordan saw Dr. Ranjan on February 2, 2015, Jordan reported feeling depressed, anxious, irritable, depressed, she was having panic attacks, and she had been crying all week. Tr. 773. Jordan's symptoms were reported as no more than moderate. Tr. 773. On mental status examination, Dr. Ranjan noted that Jordan was well groomed; her eye contact and motor activity were average; she was cooperative; her speech was clear and normal; she had A/V hallucinations; her thought process was logical; her mood was depressed, anxious and irritable; her affect was constricted; her attention/concentration were impaired; her memory was normal; her insight/judgment were good; her impulse control was normal; and she had compulsions of checking, arranging, and cleaning. Tr. 774-775. Dr. Ranjan noted that Jordan was not making progress on her goals. Tr. 777. He continued Jordan on Latuda and Trileptal (at an increased dose). Tr. 776. He discontinued Trazadone and started Jordan on Remeron. Tr. 776.

During an April 17, 2015, visit with Dr. Ranjan, Jordan reported that she had not received all of her medication because a prior authorization was required for Remeron and Trileptal. Tr. 778. She had only been taking Latuda. Tr. 778. Dr. Ranjan planned to follow up regarding the required authorizations. Tr. 778. Jordan's symptoms were reported to be no more than

moderate.  Tr. 778.  Dr. Ranjan's mental status examination findings were similar to the February 2015 visit.  Tr. 780.  Dr. Ranjan noted no progress towards goals and continued Jordan's medications.  Tr. 781.

Jordan saw Dr. Ranjan on June 19, 2015.  Tr. 783-788.  Dr. Ranjan indicated that Jordan was stable and making progress towards her goals.  Tr. 787.  Her medications were continued.  Tr. 786.

In September 2015, Jordan saw Deanna Courture, a physician assistant, for management of her medication (9/4/15 (Tr. 789-793)) and she saw Dr. Ranjan (9/18/15 (Tr. 794-798)).  When Jordan saw Dr. Ranjan on September 18, 2015, she reported that she was "doing ok."  Tr. 794.  Her symptoms were reported to be no more than moderate.  Tr. 794.  Jordan was continued on Latuda for anxiety and depression; Equatro for her mood; Trazadone for sleep; and Gabapentin for anxiety.  Tr. 797.

When Jordan saw Ms. Courture on November 20, 2015, for medication management, Jordan relayed that she was having a rough week.  Tr. 799.  She was very upset about a call from her brother that pertained to past incidences of sexual abuse.  Tr. 799.  Jordan was very tearful and upset.  Tr. 799.  Jordan was sent to the emergency room.  Tr. 799.  She was hospitalized from November 21, 2015, through November 23, 2015.  Tr. 613-617.  At discharge, Jordan's condition was described as good.  Tr. 613.  Her mental status exam showed that Jordan was well groomed; she behaved appropriately; she was oriented to person, place, time and situation; her speech/language were appropriate; her mood and affect were euthymic; her thought form was logical and her thought content was coherent; she had no suicidal or homicidal ideation, intent, or plan; her insight/judgment were appropriate; her memory was intact; and her psychomotor activity was normal.  Tr. 614.

When Jordan saw Dr. Ranjan on January 8, 2016, Jordan reported that she had been in the hospital for three days. Tr. 849-853. She was taking her medication consistently since her discharge. Tr. 849. She had severe anxiety and panic. Tr. 849. She relayed that she had not been out of the house alone in eight years. Tr. 849. Jordan's symptoms were reported to be no more than moderate. Tr. 849. Dr. Ranjan observed that Jordan was well groomed; she had average eye contact and motor activity; she was cooperative; her speech was clear/normal; she reported no delusions; she reported no hallucinations; her thought process was circumstantial; her mood was depressed and anxious; her affect was full; her attention/concentration were impaired; her memory was normal; her reasoning ability was grossly impaired; her insight was poor; her judgment was impaired; her impulse control was impaired; and she had no obsessions or compulsions. Tr. 850-851. Dr. Ranjan noted that Jordan's condition was deteriorating. Tr. 852. Dr. Ranjan continued Jordan's medications and encouraged her to attempt PHP again. Tr. 852, 853.

On April 1, 2016, Jordan saw a nurse for medication management. Tr. 826-831. Jordan reported that she was continuing to struggle with her symptoms. Tr. 826. She felt that her medication was not working and requested medication adjustments. Tr. 826. She was attending PHP biweekly. Tr. 826. Her symptoms were noted to be no more than moderate. Tr. 826-827.

### 2. Opinion evidence

#### a. Treating

*May 4, 2015*

On May 4, 2015, Dr. Waltman of the Charak Center for Health & Wellness completed a statement, indicating that he had first seen Jordan on October 24, 2014, and last seen her on April 30, 2015. Tr. 545-547. Dr. Waltman indicated that Jordan had a history of at least seven years

of depression and had been diagnosed in the past with bipolar disorder, schizophrenia, anxiety and borderline personality disorder. Tr. 546. Dr. Waltman indicated that Jordan suffered from paranoid delusions, audio and visual hallucinations, depressed/sad mood, anhedonia, low energy/self-esteem, appetite and sleep disturbance and occasional suicidal ideation. Tr. 546.

When asked to describe all the pertinent medical findings on clinical examination related to Jordan's condition, Dr. Waltman referred to therapy notes from April 17, 2015, and April 30, 2015, and pharmacologic management notes from April 17, 2015. Tr. 546. Dr. Waltman noted that the April 17, 2015, notes reflected that Jordan was crying/sleeping throughout the day and "waiting to die" but denied suicidal ideation on that particular day. Tr. 546. Dr. Waltman reported that the April 17, 2015, pharmacologic management notes reflected moderate depression/anxiety; irritability; racing thoughts; trouble staying asleep; poor appetite/energy; hearing footsteps and whispering; seeing shadows; compulsive cleaning/arranging; depressed/irritable anxious mood; and constricted affect. Tr. 546. Dr. Waltman indicated that the April 30, 2015, therapy notes reflected that Jordan was lonely/overwhelmed, had a history of trauma, and was tearful. Tr. 546.

Dr. Waltman relayed that an initial psychiatric evaluation and diagnostic assessment had been completed. Tr. 546. Jordan was attending behavioral health therapy sessions on a biweekly basis and receiving pharmacological management. Tr. 546, 547. Dr. Waltman indicated that Jordan shared openly and appropriately during therapy sessions and seemed receptive to suggestions/coping skills. Tr. 547. With respect to medications that Jordan was taking, Dr. Waltman indicated that, as of April 27, 2015, Jordan was only taking Latuda and was waiting for authorization for Trileptal and Remeron. Tr. 547. Dr. Waltman noted that Jordan had been compliant with her medication but she made little progress so Remeron was added on April 17,

2015.  Tr. 547.  Dr. Waltman noted only a minimal issue as to interference with treatment due to issues of compliance, noting that Jordan cancelled appointments infrequently and had a few no-shows but would reschedule.  Tr. 547.

When asked to describe any limitations Jordan's impairments posed on her ability to perform sustained work activity, Dr. Waltman stated:

> The client struggles w/ low motivation and energy which can make small tasks seem too much for her.  She struggles with paranoid delusions and A/V hallucinations which lead to trust issues and distractibility.  Client's depression, anxiety & irritability are moderate at best; struggles with appropriate social interactions and will struggle with constructive criticism.

Tr. 547.

### March 18, 2016

On March 18, 2016, Dr. Waltman completed a Medical Source Statement.  Tr. 853-859. At the time of completion, Dr. Waltman indicated that Jordan had been receiving treatment from the Charak Center for about a year.  Tr. 854.  She was attending PHP (partial hospitalization program) group sessions two times each week, seeing a therapist two times each month, and being seen for medication management.  Tr. 854.  Jordan's diagnoses were schizoaffective disorder, bipolar type; depression; and anxiety.  Tr. 854.  Jordan's current GAF score was 46 and her highest GAF score in the prior year was 45.[8]  Tr. 854.   The only listed medication was Gabapentin.  Tr. 854.  Jordan's medication side effects were upset stomach, light headedness, and nausea.  Tr. 854.

When asked to describe the clinical findings, including results of mental status examination that demonstrated the severity of Jordan's mental health impairment and symptoms,

---

[8] A A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)."  *Id.*

Dr. Waltman stated "her anxiety is disabling, she has difficulty leaving the house and being in public." Tr. 854. Dr. Waltman indicated that Jordan's prognosis was poor and her progress was very slow. Tr. 854.

Dr. Waltman was asked to rate Jordan's work-related abilities in various categories as "unlimited or very good," "limited but satisfactory," "seriously limited, but not precluded," "unable to meet competitive standards," and "no useful ability to function." Tr. 856-857.

With respect to Jordan's abilities and aptitude needed to perform unskilled work, Dr. Waltman opined that Jordan had a "limited but satisfactory" ability to sustain an ordinary routine without special supervision and be aware of normal hazards and take appropriate precautions. Tr. 856. Dr. Waltman opined that Jordan was "seriously limited, but not precluded" in her ability to maintain regular attendance and be punctual within customary, usually strict tolerances and in her ability to accept instructions and respond appropriately to criticism from supervisors. Tr. 856. Dr. Waltman opined that Jordan was "unable to meet competitive standards" in her ability to remember work-like procedures; maintain attention for two-hour segments; and perform at a consistent pace without an unreasonable number and length of rest periods. Tr. 856. Dr. Waltman opined that Jordan had "no useful ability to function" in her ability to understand and remember very short and simple instructions; carry out very short and simple instructions; work in coordination with or proximity to others without being unduly distracted; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms; ask simple questions or request assistance; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; and deal with normal work stress. Tr. 546. Dr. Waltman explained the limitations falling within the three most limited categories, stating

"Patient has difficulty understanding tasks due to her memory loss. Patient also cannot get along with peers because she cannot be around other people due to paranoia. Patient's depression and anxiety makes it hard to deal with stress." Tr. 856.

With respect to Jordan's abilities and aptitude needed to perform semiskilled and skilled work, Dr. Waltman opined that Jordan had a "no useful ability to function in her ability to understand and remember detailed instructions; carry out detailed instructions; set realistic goals or make plans independently of others; and deal with stress of semiskilled and skilled work. Tr. 857. Dr. Waltman explained the foregoing limitations, stating "Patient has trouble concentrating and focusing. Patient also hear[s] voices and experiences paranoia due to schizoaffective disorder, bipolar type." Tr. 857.

With respect to Jordan's abilities and aptitude needed to perform particular types of jobs, Dr. Waltman opined that Jordan had an "unlimited or very good" ability to adhere to basic standards of neatness and cleanliness and a "limited but satisfactory" ability to maintain socially appropriate behavior. Tr. 857. Dr. Waltman also opined that Jordan was "unable to meet competitive standards" in her ability to interact appropriately with the general public; and she had "no useful ability to function" in her ability to travel in an unfamiliar place or in her ability to use public transportation. Tr. 857. Dr. Waltman explained the limitations falling within the most limited categories, stating "Patient does not leave her house alone so she cannot socialize with the general public." Tr. 857.

When asked whether Jordan had a low IQ or reduced intellectual functioning, Dr. Waltman indicated that no testing was used but opined that, based on interaction and observation, Jordan's symptoms impair her intellectual functioning. Tr. 857.

Dr. Waltman opined that Jordan would find the following work demands stressful: complexity, deadlines, working within a schedule, making decisions, exercising independent judgment, completing tasks, working with other people, dealing with the public, being criticized by supervisors, getting to work regularly, remaining at work a full day, fear of failure at work, and little latitude for decision-making. Tr. 858. Dr. Waltman anticipated that Jordan's impairments or treatment would cause her to be absent from work more than 4 days per month and indicated that Jordan's impairments had lasted or were expected to last more than 12 months. Tr. 858. As further explanation as to why Jordan would have difficulty working at a regular job on a sustained basis, Dr. Waltman indicated that Jordan's "paranoia makes it impossible for [her] to leave the house." Tr. 858. Dr. Waltman indicated that Jordan would be unable to manage benefits in her own best interest. Tr. 859.

### b. Consultative psychologist

On March 16, 2015, consultative examining psychologist Dr. Herschel Pickholtz, Ed.D., completed a clinical interview and mental status evaluation. Tr. 537. On March 23, 2015, Dr. Pickholtz completed a psychological report setting forth his findings and opinions. Tr. 537-544.

Dr. Pickholtz's report reflects that Jordan reported that she had difficulties working because of her mental state – she was depressed; she saw and heard things; and she was scared to go outside. Tr. 543. Jordan relayed that she felt paranoid most of the time. Tr. 543. Dr. Pickholtz indicated that Jordan reported symptoms consistent with an unspecified mood disorder with psychotic features, which appeared to be severe even with her current medications. Tr. 543. Jordan reported a history of a learning disability. Tr. 543. She reported symptoms consistent with an unspecified anxiety disorder, which appeared to be mild but Jordan still indicated she was having some posttraumatic stress issues; most of the time she felt fearful and was not certain

what she was scared of. Tr. 543. Jordan reported a history of alcohol use disorder of a severe

nature and cocaine abuse, both of which were in remission. Tr. 543. Dr. Pickholtz indicated that

Jordan's overall capacities for attention, concentration, memory and intellectual levels of

functioning based upon her responses to the clinical interview and the cognitive section of the

evaluation fell within the lower end of the borderline range. Tr. 543. Dr. Pickholtz found that

"[t]he impact of her current psychiatric complaints relative to work functioning comparable to

the type of work she did in the past and based upon her significant mood disorder with psychotic

features suggest a rather serious impairment at this time." Tr. 543.

Dr. Pickholtz provided the following functional assessment regarding Jordan's work-

related abilities:

1. **Describe the claimant's abilities and limitations in understanding, remembering and carrying out instructions.** The estimated IQ based upon the responses to the evaluation fell in the lower end of the borderline range. Her capacities to understand, remember and carryout instructions for work comparable to the type of work she did in the past appear to be slightly impaired.

2. **Describe the claimant's abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace to perform simple tasks and to perform multi-step tasks.** Her capacities for attention and concentration based upon recall of digits forwards and backwards and mathematical computational skills fell in the borderline ranges. Her pace during the evaluation appeared to be significantly slow and her persistence appeared to be somewhat impeded and impaired by her ongoing affective issues. Her abilities to perform 1 to 3-step tasks comparable to the type of work she did in the past appears to be somewhat impaired at the present time even with her current medications.

3. **Describe the claimant's abilities and limitations in responding to supervision and to coworkers in a work setting.** Her capacities to relate to coworkers and others based upon her current symptoms and conditions and her inabilities to relating to others and feeling paranoid and fearful and she continues to have her affective issues and based upon her overall presentation and her limited contact with others suggest a serious impairment.

4. **Describe the claimant's abilities and limitations in responding to work pressures in a work setting.** Her capacities to handle the stresses and pressures

18

of work comparable to the type of work she did in the past as a result of [] the severity of the current residual symptoms and conditions and based upon her limited capacities to handle her daily demands and expectations suggest a serious impairment even with her current medications. She would deteriorate rapidly under minimal pressure and demands and I think the severity of her psychotic processing would be even worse than it is at the present time.

Tr. 544.

Dr. Pickholtz did not believe that Jordan should independently monitor benefits if awarded. Tr. 544. He found Jordan to be reliable and accurate. Tr. 544.

### c. State agency reviewing psychologists

On August 25, 2014, state agency reviewing psychologist Mary K. Hill, Ph.D., completed a Psychiatric Review Technique ("PRT") (Tr. 165-166) and Mental RFC Assessment (167-168). Relying on *Drummond*, Dr. Hill adopted the PRT and Mental RFC Assessment from the prior ALJ's June 29, 2012, decision. Tr. 166, 167. In doing so, Dr. Hill found that Jordan had the mental RFC to "perform 2 and 3 step tasks that do not involve fast-paced production quotas. She is limited to superficial interaction with others. She is limited to working in a static environment, meaning changes that are no more than occasional and are explained and gradually introduced." Tr. 167.

Upon reconsideration, on March 30, 2015, state agency reviewing psychologist Jennifer Swain, Ph.D., completed a PRT (Tr. 179-180) and Mental RFC Assessment (Tr. 181-182) and affirmed Dr. Hill's opinions.

### C. Testimonial evidence

### 1. Plaintiff's testimony

Jordan was represented and testified at the hearing. Tr. 48-83.

Jordan does not have a driver's license and does not drive. Tr. 51. She is afraid to drive. Tr. 51. Jordan has crying spells that just happen. Tr. 60. She explained that she cries because she does not "want to be here anymore[]" and she is tired. Tr. 60.

Jordan described her bipolar disorder as involving more depressive states than manic states. Tr. 66. Jordan was taking three medications for her mental health conditions. Tr. 62, 65-66. She usually takes her medication daily but, about once every couple weeks, she forgets. 78, 80, 81. Jordan does not feel that her medication helps but she does continue to take it. Tr. 81.

Jordan has no interest in anything. Tr. 67. She does not go outside often. Tr. 67. When she leaves the house, she has anxiety attacks. Tr. 67. She also has anxiety attacks at home. Tr. 67. She has anxiety attacks a couple times each week. Tr. 68. She does go shopping with her partner but she has a difficult time doing so. Tr. 69. If there are a lot of people in the store, it can bring on an anxiety attack. Tr. 69.

When Jordan worked, she isolated herself from others. Tr. 69. She was described as antisocial. Tr. 69. After being fired from her housekeeping job in 2010, Jordan attempted suicide. Tr. 81-82. She did not try to work after that time. Tr. 82.

Jordan experiences psychotic symptoms and paranoia. Tr. 69-70. She hears voices. Tr. 70. Jordan was on a medication at one point that helped minimize the voices but she was still having depression and other issues so adjustments were made to her medication. Tr. 70-71. Following those adjustments, the voices returned. Tr. 71.

She indicated she had not been outside by herself in years. Tr. 70. However, she did participate in GED classes at the library on her own but her girlfriend walked her there and picked her up. Tr. 74. There were about six or seven other students in the GED classes. Tr. 74.

Jordan had crying spells during class and it affected her ability to perform the work. Tr. 74. She was unable to concentrate. Tr. 74.

Other than dishes and sweeping the floors with a Swiffer, Jordan does not perform many household chores. Tr. 71-72. Her daughter helps out around the house and gets herself to and from school. Tr. 72-73.

When asked if her condition had changed since June of 2012, Jordan indicated her condition had worsened. Tr. 74-75. She explained that she was hospitalized and her paranoia had gotten worse. Tr. 75. Jordan felt she became totally unable to work when she started hearing voices and she indicated that, since 2012, she heard the voices more frequently. Tr. 77. Jordan felt that her mental health symptoms prevented her from working because she was afraid she would "flip out." Tr. 79.

At the time of the hearing, Jordan had been in a partial hospitalization program for about a year. Tr. 77-78. She was picked up at her home approximately two times each week for group therapy. Tr. 78. Jordan did not feel that her condition had improved since her involvement in the partial hospitalization program. Tr. 78.

### 2. Vocational Expert

Vocational Expert ("VE") Brett Salkin (Tr. 309) testified at the hearing (Tr. 83-92). The ALJ informed the VE that he was only concerned about the housekeeper position as past relevant work. Tr. 84. The VE confirmed the DOT number for that position and confirmed that the position was light and unskilled. Tr. 84.

For his first hypothetical, the ALJ asked the VE to consider an individual with Jordan's vocational profile with the RFC to perform a full range of work at all exertional levels but with the following non-exertional limitations – can perform two and three-step tasks that do not

involve fast-paced production quotas; limited to superficial interaction with others; and limited to working in a static environment, meaning changes that are no more than occasional and are explained and gradually introduced. Tr. 84. The VE indicated that the described individual would be able to perform the housekeeper position. Tr. 84.

For his second hypothetical, the ALJ asked the VE to consider an individual with the RFC to perform work at all exertional levels except she is limited to simple, routine tasks with no strict time demands, no strict production quotas; only simple work instructions and decisions and no more than minimal or infrequent changes in the work setting; limited to no direct work-related interaction with the public, and occasional interaction with coworkers and supervisors. Tr. 84-85. The VE indicated that the housekeeper position would remain available to the described individual. Tr. 85.

Jordan's counsel inquired about the duties that a housekeeper as defined under the DOT would have to perform as well as the meaning of fast-paced production quotas. Tr. 85-88, 89-92. Counsel for Jordan asked the VE whether there would be any jobs that an individual could perform if the individual, due to depression, was absent from work more than two times per month on an ongoing basis. Tr. 88. The VE indicated that there would be no jobs available. Tr. 88. The VE also indicated that, if an individual was off task at work more than 15 percent of the time due to severe medically determinable impairments, there would be no jobs that the individual could perform. Tr. 88.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[9] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to

follow a five-step sequential analysis set out in agency regulations. The five steps can be

summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[10] claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

---

[9] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A).

[10] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 416.925.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

## IV. The ALJ's Decision

In his March 2, 2017, decision, the ALJ made the following findings:[11]

1. Jordan has not engaged in substantial gainful activity since May 19, 2014, the application date. Tr. 23.

2. Jordan has the following severe impairments: schizoaffective disorder, bipolar type; depressive disorder; anxiety-related disorder; and borderline intellectual functioning. Tr. 23. Jordan's physical impairments are non-severe. Tr. 23.

3. Jordan does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. Tr. 23-26.

4. Jordan has the RFC to perform a full range of work at all exertional levels, but with the following nonexertional limitations: she is limited to simple, routine, tasks with no strict time demands, no strict production quotas, and only simple work instructions and decisions, and no more than minimal or infrequent changes in the work setting. She is further limited to no direct work-related interaction with the public and occasional interaction with coworkers and supervisors. Tr. 26-33.

5. Jordan is capable of performing past relevant work as a housekeeper. Tr. 33-34. This work does not require the performance of work-related activities precluded by Jordan's RFC. Tr. 33-34.

6. Jordan has not been under a disability, as defined in the Social Security Act, since May 19, 2014, the date the application was filed. Tr. 34.

---

[11] The ALJ's findings are summarized.

## V. Plaintiff's Arguments

Jordan argues that the ALJ erred when evaluating the opinion of Dr. Pickholtz, a consultative examining psychologist. Doc. 15, pp. 13-16. Jordan also argues that the ALJ erred in his evaluation of the opinions rendered by Dr. Waltman. Doc. 15, pp. 17-23.

## VI. Law & Analysis

### A.     Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**B.      The ALJ did not commit reversible error when considering and weighing Dr. Waltman's opinions.**

Jordan argues that the ALJ erred in evaluating the opinions of her treating psychologist Dr. Waltman.  Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'"  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for the weight he assigns to the opinion.  *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544; *Cole v. Comm'r of Soc. Sec.*, 661 F.3d 931, 937 (6th Cir. 2011).  In deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c).

An ALJ is not obliged to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions.  *See Francis v. Comm'r of Soc. Sec*., 414 Fed. Appx. 802, 804 (6th Cir. 2011).  However, the "good reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that

weight." *Cole*, 661 F.3d at 937 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, at *12

(Soc. Sec. Admin. July 2, 1996)) (internal quotations omitted).

Where there is no ongoing treatment relationship, an opinion is not entitled to deference

or controlling weight under the treating physician rule. *See Kornecky v. Comm'r of Soc. Sec*, 167

Fed. Appx. 496, 508 (6th Cir. 2006)*; Daniels v. Comm'r of Soc. Sec.,* 152 Fed. Appx. 485, 490

(6th Cir. 2005).

Here the ALJ considered and weighed the opinions rendered by Dr. Waltman, stating

The undersigned also considered opinions provided by the claimant's treating psychologist, Douglas Waltman. Ph.D. Dr. Waltman completed a questionnaire on May 4, 2015 after approximately six months of treatment and indicated that the claimant received an initial psychiatric evaluation and diagnostic assessment (Ex. B11F/2). As of the most recent visit prior to completion of the questionnaire, Dr. Waltman opined that little progress had been made; however, the claimant had not started her full medication regimen (Ex. B11F/3). Dr. Waltman also opined that the claimant struggled with low motivation and energy, paranoid delusions, hallucinations, trust issues, distractibility, irritability, and social interactions, and will struggle with constructive criticism (Ex. B11F/3).

Dr. Waltman also completed a Mental Medical Source Statement (MSS) on March 18, 2016 (Ex. Bl9F). Dr. Waltman noted a treatment history of about a year and indicated her prognosis as poor with progress being very slow (Ex. Bl9F/l). Dr. Waltman opined that the claimant would have no useful ability to do semi-skilled and skilled work (Ex. Bl9F/4). Dr. Waltman further opined that the claimant's mental abilities and aptitudes needed to do unskilled work ranged primarily from unable to meet competitive standards to no useful ability to function (Ex. Bl9F/3). He noted that the claimant has difficulty understanding tasks due to her memory loss, is unable to be around other people due to paranoia, and depression and anxious cause difficulty dealing with stress. Dr. Waltman also noted that the claimant does not leave her house alone and is unable to socialize with the public (Ex. Bl9F/4). Dr. Waltman also GAF score of 46, indicating serious symptoms (Ex. Bl9F/l).

Generally, more weight is given to the opinions of treating sources because they are likely to be most able to provide a detailed, longitudinal picture of the claimant's impairments (20 CFR 416.927(c)(2) and SSR 96-2p). If a treating source's medical opinion on the issue of the nature and severity of the claimant's impairments is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence of record, the undersigned will give the opinion controlling weight. However, the final responsibility for

deciding the issue of residual functional capacity and the ultimate issue of disability is reserved to the Commissioner (20 CFR 416.927(d), SSR 96-2p, and SSR 96-5p). A statement by a medical source that the claimant is "disabled" or "unable to work" does not mean that the claimant will be determined to be disabled as that term is defined in the Act (20 CFR 416.927(d)(l) and Social Security Ruling 96-2p).

While Dr. Waltman is a treating source, the undersigned finds his opinion is generally not supported by the evidence of record. The undersigned gives limited weight to Dr. Waltman's opinion rendered on May 14, 2015 that provided limitations on the claimant's ability to perform sustained work activity because he based this mainly on subjective information (Ex. B11F/3).

The undersigned also gives limited weight to Dr. Waltman's MSS provided on March 18, 2016 that the claimant had no useful ability to function in the majority of mental ability categories as the medical evidence of record does not support such extreme limitations and that the claimant's symptoms were generally moderate (Exs. B11F/30, 35, B17F/l-33, Bl8F/5-6, 28). Further, the undersigned finds that the medical evidence of record does not support Dr. Waltman's opinion regarding absenteeism. For example, the claimant attended appointments and reported improvement with treatment, and the claimant was accomplishing tasks (Exs. B5F/5, 22, B8F/2, B13F/3, 9, Bl8F/3-4). In addition, the opinion that the claimant's anxiety is disabling is an issue reserved to the Commissioner. The undersigned also notes Dr. Waltman's GAF score of 46 and gives it limited weight because it is inconsistent with other GAF scores of 55, indicating moderate symptoms (Ex. B17F/21). Accordingly, the undersigned finds that Dr. Waltman's opinion is inconsistent with the record as a whole and gives his opinion limited weight.

Tr. 32-33.

Jordan contends that the ALJ did not properly apply the treating physician rule when weighing Dr. Waltman's opinions. Jordan argues that the ALJ did not specifically discuss the factors in 20 C.F.R. § 416.927(c) when weighing Dr. Waltman's opinion. She also argues that the analysis that the ALJ did provide was legally insufficient.

Initially the Court notes that there are few treatment notes authored by Dr. Waltman himself or cited by Jordan in her brief. Most of the treatment received by Jordan appears to have been rendered by Dr. Ranjan or counselors. Thus, the ALJ's designation of Dr. Waltman as a treating source may not have been warranted. However, since the ALJ considered Dr. Waltman as a treating source and applied the treating physician rule and since the Commissioner does not

contend that Dr. Waltman was not a treating physician, the Court addresses the entirety of Jordan's treating physician argument.

With respect to the factors set forth in 20 C.F.R. § 416.927(c), Jordan first argues that the ALJ did not find that Dr. Waltman did not have reasonable knowledge of Jordan's impairments and, therefore, he was required, under 20 C.F.R. § 416.927(c)(2)(ii), to provide more weight to Dr. Waltman's opinion than to nontreating sources. Doc. 15, pp. 17-18. The section relied upon by Jordan, i.e. 20 C.F.R. § 416.927(c)(2)(ii), pertains to the nature and extent of the treatment relationship. The ALJ clearly considered 20 C.F.R. § 416.927(c), which provides that, *generally*, more weight is given to opinions of treating sources. Tr. 32 (citing 20 C.F.R. § 416.927(c)(2) and SSR 96-2p). The regulations do not dictate what weight must be assigned. Rather, the nature and extent of the treatment relationship, which includes consideration of whether the treating source has reasonable knowledge of a claimant's impairments, is only one factor to be taken into account when an ALJ assesses the weight to be assigned to a medical opinion. The ALJ acknowledged that Dr. Waltman was a treating source and acknowledged the extent of the treatment relationship. Tr. 32 (noting that the May 4, 2015, opinion was rendered after about six months of treatment and the March 18, 2016, opinion was rendered after about a year of treatment). The Court finds that the ALJ properly took into account the nature and extent of the treatment relationship between Dr. Waltman and Jordan and finds no basis upon which the ALJ was obligated to assign greater weight to Dr. Waltman's opinions because he did not find or suggest that Dr. Waltman did not have reasonable knowledge of Jordan's impairments.

Second, Jordan argues that the ALJ did not acknowledge or discuss Dr. Waltman's medical specialty, i.e., the ALJ did not acknowledge that Dr. Waltman was a clinical psychologist. Doc. 15, p. 18. She claims this was error because, under the regulations,

generally, more weight is given to the opinion of a specialist about medical issues related to his area of specialty than to the opinion of someone who is not a specialist. Doc. 15, p. 18 (relying on 20 C.F.R. § 416.927(c)(5). In pointing out that Dr. Waltman is a clinical psychologist, Jordan relies not on the administrative record before the Court but rather on a URL citation - https://www.healthgrades.com/providers/douglas-waltman-xnp7j. There is no indication, however, whether this information was before the ALJ. In any event, the ALJ identified Dr. Waltman as a psychologist. Tr. 32. Based on the foregoing, the Court finds no reason to find error on the basis that the ALJ did not identify Dr. Waltman as a clinical psychologist.

Third, Jordan contends that, contrary to 20 C.F.R. § 416.927(c)(1), the ALJ gave no consideration to the fact that Dr. Waltman actually examined Jordan on multiple occasions. Doc. 15, p. 18. Jordan cites to no specific records documenting the multiple occasions that Dr. Waltman examined Jordan. Furthermore, the ALJ considered Dr. Waltman a *treating* psychologist. Tr. 32. Thus, the Court is uncertain as to the basis for Jordan's claim that the ALJ did not take into account that Dr. Waltman examined Jordan.

Fourth, Jordan argues that the ALJ did not consider the consistency between Dr. Waltman's opinion and the opinion rendered by consultative examining psychologist Dr. Pickholtz. The ALJ discussed the details of all the opinions and weighed the opinions of both psychologists. Tr. 31-33. Further, assuming arguendo that the opinions of the two psychologists are similar, the ALJ, not a physician, is responsible for assessing a claimant's RFC. *See* 20 C.F.R. § 416.946 (c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir.2009). Considering the foregoing, the Court finds that reversal and remand is not warranted for further analysis of the opinions of Dr. Waltman as comparted to the opinion of Dr. Pickholtz.

With respect to Jordan's claim that the ALJ's stated reasons for providing limited weight to Dr. Waltman's opinion are legally insufficient, Jordan first argues that the ALJ improperly discounted Dr. Waltman's opinion on the basis that it was based mainly on subjective information provided by Jordan. While it is understandable that a physician will hear and report subjective statements from a patient, it is not improper for an ALJ to take into account and discount an opinion founded primarily on a claimant's subjective statements. *See Kepke v. Comm'r of Soc. Sec.*, 636 Fed. Appx. 625, 629 (6th Cir. 2016) ("Regardless of the inherent subjectivity in the field of psychiatry, a doctor cannot simply report what his patient says and re-package it as an opinion."). Additionally, the ALJ did not discount Dr. Waltman's opinion solely on the basis that it was based on subjective reports from Jordan.

Second, Jordan argues that the ALJ should not have discounted Dr. Waltman's opinion on the basis that Dr. Waltman offered an opinion on an issue reserved to the Commissioner, i.e., an opinion that Jordan was disabled. The ALJ did not discount the entirety of the opinion on that basis. Additionally, whether a claimant is disabled is an issue reserved to the Commissioner and, therefore, it was appropriate for the ALJ to discount Dr. Waltman's opinion that Jordan's impairments were disabling or resulted in an inability to perform work. Tr. 32-33.

Third, Jordan challenges the ALJ's decision that Dr. Waltman's opinions were inconsistent with the medical records. Jordan's argument amounts to a request that the Court try the case de novo or resolve conflicts in evidence, which is not the role of this Court. *Garner*, 745 F.2d at 387. Further, even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. Here, while Jordan disagrees with the ALJ's weighing and consideration of the

evidence, Jordan has not shown that the ALJ's finding that Dr. Waltman's extreme functional limitations were inconsistent with medical records is unsupported by substantial evidence. Nor has Jordan shown that the ALJ improperly relied on his own lay analysis of the raw medical data. The ALJ weighed Dr. Waltman's opinions in light of the entirety of the record.

For the reasons discussed herein, the Court finds that reversal and remand is not warranted for further analysis or weighing of Dr. Waltman's opinions. The Court finds that the ALJ's analysis of Dr. Waltman's opinions satisfied the requirements of the treating physician rule and Jordan has not demonstrated that the ALJ's decision to assign limited weight to Dr. Waltman's opinions is not supported by substantial evidence.

### C. The ALJ did not commit reversible error when considering and weighing Dr. Pickholtz's opinion

Jordan argues that the ALJ erred when evaluating the opinion of Dr. Pickholtz, a consultative examining psychologist. Jordan asserts reversible error, arguing that the ALJ assigned considerable weight to Dr. Pickholtz's opinion but did not include all of Dr. Pickholtz's limitations in the RFC and/or did not explain why all the limitations were not included in the RFC. The ALJ considered and explained the weight assigned to Dr. Pickholtz's opinion, stating

> The undersigned also considered the opinion of Herschel Pickholtz, Ed.D., who conducted a psychological consultative evaluation on March 16, 2015 (Ex. B10F). The claimant reported that her mental state prevented her from working (Ex. B10F/3). Dr. Pickholtz described the claimant as dressed appropriately for the evaluation and season, and her gait and posture were appropriate but tended to cry "a lot" (Ex. B10F/6). The claimant reported that she takes care of her hygiene, shops for food once a month, uses the phone daily and talks to a girlfriend and family members, operates the television daily, and gets her daughter ready for school (Ex. B10F/7). He noted she was compliant and had some difficulties in terms of understanding and responding to questions and directives (Ex. B10F/6). She appeared anxious and depressed and speech was slow, although easily understood and intelligible. Dr. Pickholtz estimated the claimant's IQ to fall within the borderline range (Ex. B10F/7). He also noted her ability to recall fell within the borderline range or extremely low range and capacities related to serial sevens feel within the borderline range.

Based on his findings Dr. Pickholtz opined that the claimant's capacities to understand, remember, and carryout instructions for work comparable to the type of past work appear to be slightly impaired (Ex. Bl0F/9). Her ability to perform one-to-three step tasks comparable to work she did in the past appeared to be somewhat impaired. Dr. Pickholtz further opined that the claimant appeared to have a serious impairment in her ability to relate to supervision and coworker in a work setting and respond to work pressures in a work setting. The undersigned finds that Dr. Pickholtz's opinion regarding slight to some impairment with understanding, remembering, and carrying out instructions and performing one-to-three step tasks is consistent with progress notes that indicated the claimant verbalized understanding of information given to her, had no barriers to learning, and cognitive function was sufficient for dialogue with her therapist (Ex. B5F/3, 8, 17, 25). The undersigned also finds examination findings indicating an estimated average level of intelligence support this opinion (Exs. B6F/7, B7F/5, B11F/26, 32, 37, Bl2F/23, B17F/2-30, Bl8F/7, 30). The undersigned also finds that Dr. Pickholtz's opinion regarding the claimant's serious impairment in relating to others and handling work stress is consistent with progress notes that included reports of difficulty with interpersonal relationships, handling stressful situations, and experiencing hallucinations, mood swings, and irritability (Exs. B5F/2, 16, B6F/4, 6-7, B7F/2, 4-5, B11F/3, 20, B17F/38-54, Bl8F/l-2). Accordingly, the undersigned gives considerable weight to Dr. Pickholtz's opinion to the extent it supports the mental residual functional capacity set forth in this decision.

Tr. 31-32.

The ALJ included the following limitations in the RFC to account for Jordan's

mental health impairments:

limited to simple, routine, tasks with no strict time demands, no strict production quotas, and only simple work instructions and decisions, and no more than minimal or infrequent changes in the work setting. She is further limited to no direct work-related interaction with the public and occasional interaction with coworkers and supervisors.

Tr. 26.

The Regulations make clear that a claimant's RFC is an issue reserved to the

Commissioner and the ALJ assesses a claimant's RFC "based on all the relevant evidence in

your case record." 20 C.F.R. §§ § 416.945(a)(3), 416.946(c). The ALJ, not a physician, is

responsible for assessing a claimant's RFC. *See* 20 C.F.R. § 416.945(c); *Poe*, 342 Fed. Appx. at

157.  In assessing a claimant's RFC, an ALJ "is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding . . . [and] an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Id.*  Thus, contrary to Jordan's contention, while the ALJ assigned considerable weight to Dr. Pickholtz's opinion, the ALJ was not required to incorporate the entirety of Dr. Pickholtz's opinion into the RFC assessment.

Furthermore, Jordan has not shown that the RFC limitations that the ALJ included in the RFC do not adequately account for Dr. Pickholtz's opinion.  For example, Jordan contends that the RFC did not account for Dr. Pickholtz's opinion that Jordan had serious impairment in her ability to relate to others and handle work stress.  However, the ALJ recognized and explained how he accounted for social limitations that the ALJ found supported by the record.  Tr. 30, 33. Also, to account for Jordan's symptoms from depression and anxiety and estimated intelligence levels, the ALJ limited Jordan to simple, routine, tasks with no strict time demands, no strict production quotas, and only simple work instructions and decisions, and no more than minimal or infrequent changes in the work setting.    Tr. 33.

Based on the foregoing, the Court finds that Jordan has not demonstrated error with respect to the ALJ's consideration of Dr. Pickholtz's opinion nor demonstrated that the ALJ failed to adequately account for limitations contained in Dr. Pickholtz's opinion when formulating Jordan's RFC.   Accordingly, the Court finds no error with respect to the ALJ's consideration of Dr. Pickholtz's opinion.

## VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.


Dated: February 13, 2019                    _/s/ Kathleen B. Burke_
                                            Kathleen B. Burke
                                            United States Magistrate Judge